UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
DR. DAVID BEACH and CHRISTOPHER
KELLY, individually and on behalf of all
similarly situated persons,

                           Plaintiffs,

          -against-

CITIGROUP ALTERNATIVE INVESTMENTS
LLC, CITIGROUP, INC., JOHN PICKETT, and
CCA CREDIT EUROPE LIMITED,

                      Defendants.
-------------------------------------------------------------x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _3-7-14_

12 Civ. 7717 (PKC)

MEMORANDUM
AND ORDER

CASTEL, U.S.D.J.

        Plaintiffs Dr. David Beach and Christopher Kelly bring this putative class action

complaint against defendants Citigroup Alternative Investments LLC ("CAI"), Citigroup, Inc.,

John Pickett, and CCA Credit Europe Limited, f/k/a CSO Partners Limited ("CPL").  They

invoke this Court's class action diversity jurisdiction under the Class Action Fairness Act

("CAFA"), 28 U.S.C. § 1332(d), and assert only state law claims for fraud, fraudulent

concealment, and negligent misrepresentation.  CAI and Citigroup move to dismiss the claims

against them for failure to state a claim pursuant to Rule 12(b)(6), Fed. R. Civ. P.  (Docket # 65.)

Pickett and CPL move to dismiss the claims against them for lack of personal jurisdiction

pursuant to Rule 12(b)(2), Fed. R. Civ. P., and in the alternative, join CAI and Citigroup's

motion to dismiss.  (Docket # 69, 76.)

        The principal claims are that CPL negligently or fraudulently misled the investor-

plaintiffs with respect to their investment in a fund investing in stressed, distressed, and special

situation debt obligations, and that defendants Citigroup, CAI, and Pickett were either actively

involved in CPL's actions, or aided and abetted those actions.  For reasons explained, the Court

concludes that there is no personal jurisdiction over defendants CPL, a United Kingdom limited

liability company with its principal place of business in London, and Pickett, a citizen of the

United Kingdom.  For reasons further explained, CAI and Citigroup's motion to dismiss for

failure to state a claim is granted, except with respect to the claims against Citigroup and CAI

arising out of statements in the PPM, and the claims against CAI arising out of CPL's

communications to investors.

BACKGROUND

The following facts are taken from the Third Amended Complaint (the "TAC"),

documents incorporated by reference in the TAC, and matters of which judicial notice may

appropriately be taken.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 152–53 (2d Cir.

2002).  All facts are assumed to be true for the purpose of deciding defendants' motions to

dismiss.  All reasonable inferences are drawn in favor of the plaintiffs as non-movants.  See In re

Elevator Antitrust Litig., 502 F.3d 47, 50–51 (2d Cir. 2007) (per curiam).

Corporate Special Opportunities ("CSO") was an investment business established

in 1999 by defendant Citigroup, through its subsidiary, defendant CAI, to manage Citigroup's

proprietary capital in investment markets.  (Third Am. Compl. ("TAC") ¶¶ 29–30, 34.)  In 2004,

Citigroup established Corporate Special Opportunities Ltd., a fund which acted as a common

investment vehicle to allow Citigroup clients to access CSO's investments.  (Id. ¶¶ 25, 34.)

Citigroup also established two other funds, CSO Ltd. and CSO US Ltd., as feeder funds for

Corporate Special Opportunities Ltd.  (Id. ¶ 25.)  All three entities (collectively the "Fund") were

CAI subsidiaries incorporated in the Cayman Islands.  (Id. ¶ 34; Soloway Decl. Ex. 2, at 18; Tom

Decl. Ex. 2, at 7.)

According to the private placement memorandum ("PPM"), the Fund's stated investment objective was "to generate attractive risk-adjusted returns with low volatility." (Soloway Decl. Ex. 2, at 20.) Its investment strategy was "to invest principally in stressed, distressed and special situations debt obligations of corporations incorporated predominantly in the United States, the United Kingdom and the rest of the European Union (including the accession States)." (Id.)

In detailing risk factors to Fund investors, the PPM noted that it might engage in leveraged investing, which could increase volatility. (Id. at 75.) The PPM further noted that though there was no maximum permitted leverage, Citigroup's internal risk management would monitor investment activities to ensure they were "consistent" with the Fund's investment restrictions. (Id.) Internally, maximum leverage was set at six times the Net Asset Value ("NAV") of the Fund. (TAC ¶ 38.) The NAV was calculated "at the close of business in New York on or as of each Valuation Day or at such other times as the Directors may determine" by the Fund administrator, GlobeOp Financial Services (Cayman) Limited, a Cayman Islands corporation with its principal place of business there. (Soloway Decl. Ex. 2, at 37–38, 51.)

Starting on August 18, 2006, defendant CPL, a Citigroup subsidiary incorporated as a limited liability company in the United Kingdom, with its principal place of business in London, assumed the role of investment manager for the Fund. (Id. ¶ 31.) As investment manager, CPL was in charge of investing the Fund's assets "in a manner consistent" with its "investment objective, strategy and restrictions." (Soloway Decl. Ex. 2, at 31.) At that time, defendant John Pickett, a resident of London, was CPL's CEO. (TAC ¶ 32; Pickett Decl. ¶ 5.) Pickett's responsibilities included choosing investments for the Fund and communicating with its investors. (TAC ¶ 32.) The PPM designated Pickett as a "key man" and provided a mechanism

for investor redemption of shares, including a method of determining their value, should he "cease[] to be employed by or otherwise affiliated with" CPL.  (TAC ¶ 41; Soloway Decl. Ex. 2, at 44, 47–49.)

In advertising the Fund, CAI published sales materials, including a booklet detailing the Fund's historical performance and investment strategies.  (TAC ¶¶ 64–65.)  Similar to statements in the PPM, the sales materials stated the Fund's investment goals were "to capture high returns with a low degree of volatility, market correlation and draw downs."  (Id. ¶ 65.)  The marketing materials further stated that CAI exercised supervisory authority and independent risk management over the CPL and the Fund.  (Id. ¶ 70.)  CPL and CAI also had ties outside of their relationship through the Fund.  From February 2006, they had the same General Counsel, and, later, the same managing director.  (Id. ¶¶ 50–51.)

In order to invest in the Fund, investors were required to sign a subscription agreement with either CSO Ltd. (for investors outside the United States), or CSO US Ltd. (for investors inside the United States), which incorporated the PPM by reference into its terms. (Soloway Decl. Ex. 3, at 7; Tom Decl. Ex. 1, at 1.)  By signing the subscription agreements, investors warranted that they had relied solely on the PPM and their own independent investigations in making the decision to invest.  (Soloway Decl. Ex. 3, at 3; Tom Decl. Ex. 1, at 4.)  Investors further warranted that they did not rely on "the Fund, the Investment Manager, the Administrator, the Placement Agent, . . . , or any other person or entity" in making their decisions to invest.  (Soloway Decl. Ex. 3, at 3; Tom Decl. Ex. 1, at 4.)

Both the CSO Ltd. and CSO US Ltd. subscription agreements contained a forum selection clause which stated, in relevant part,

> This Agreement shall be construed in accordance with and
> governed by the laws of the State of New York without

> regard to its conflicts of law rules, notwithstanding the
> place where this Agreement may be executed by any party.
> The courts of the State of New York shall have exclusive
> jurisdiction over any action, suit or proceeding with respect
> to this Subscription Agreement . . . .

(Soloway Decl. Ex. 3, at 7; Tom Decl. Ex. 1, at 8.)

On January 29, 2007, plaintiff David Beach, a citizen and resident of the United

Kingdom, in reliance on the PPM and subscription agreement, purchased interests in CSO Ltd.

(TAC ¶ 27.) Plaintiff Christopher Kelly, a citizen and resident of the State of New Jersey, in

reliance on the PPM and subscription agreement, purchased interests in CSO US Ltd. on

February 14, 2007. (Id. ¶ 28; Tom Decl. Ex. 1, at 11.)

In or about May 2007, Michael Micko, an investment manager at CPL, as well as

a CAI executive, made an oral offer to the Managing Lead Arrangers ("MLAs") of a syndicated

loan to ProSieben, a German broadcast company, offering to purchase approximately €1.25

billion of a €7.2 billion loan. (TAC ¶¶ 51, 74.) Beach and Kelly allege that Micko acted on

Pickett's instruction and authority. (Id. ¶ 74.) The commitment requested was multiple times

the total NAV of the Fund. (Id.)

Beach and Kelly assert that neither the offer, nor its confirmation, was recorded

by CPL or CAI. (Id. ¶¶ 75–77.) Furthermore, the order exceeded the Fund's internal trading

limits on leverage. (Id. ¶ 78.) After confirming the offer, the MLAs allocated approximately

€558 million of debt to the Fund and notified CPL of the allocation on June 29, 2007. (Id. ¶ 79.)

Initially, Pickett refused to honor the allocation notice, viewing it as a material change in the

terms of the agreement. (Id. ¶ 80.) However, CAI and Citigroup executives, including John

Havens, CAI's CEO, intervened and ordered Pickett to consummate the deal. (Id. ¶¶ 81–83.) In

late November, or early December, 2007, after prolonged negotiations, CAI and the MLAs

agreed to the Fund taking an allocation of €512 million in the ProSieben transaction. (Id. ¶ 89.)

Soon after the deal had been completed, Pickett was fired. (Id. ¶ 7.) Picket was replaced by

Micko, who reported to the co-head CAI's global fixed income group. (Id. ¶ 94.)

On December 14, 2007, CPL sent a letter to Fund investors informing them of the

ProSieben settlement and its impact on the Fund, but did not mention ProSieben by name. (Id.

¶¶ 90–91.) The letter noted that the Fund was down 12.6% on a gross basis, but the quality of

the portfolio was "fundamentally sound." (Id. ¶¶ 91, 95.) The letter also informed investors of

Pickett's departure, but discouraged them from redeeming their shares under the "key man"

provision of the PPM. (Id. ¶ 95.) The letter was signed by Micko, and was sent on CAI

letterhead, bearing a London address. (Id. ¶¶ 90, 93; Soloway Decl. Ex. 4, at 1.)

On December 19, 2007, CPL officially notified investors that Pickett's departure

triggered a "Key Man Event" and gave them a 90-day period during which they could elect to

redeem their shares. (TAC ¶ 96.) On January 23, 2008, CPL issued a Monthly Performance

Report for the Fund, which mentioned ProSieben by name. (Id. ¶ 100.) The Report indicated

that the Fund's leverage was 7.58 times the NAV. (Id.) According to Beach and Kelly, this was

the first time investors ever saw the name "ProSieben." (Id.) Two days later, CPL notified

investors that "redemptions of all shares [had] been temporarily suspended until such time as the

boards resolve otherwise." (Id. ¶ 105.) The letter was signed by Micko on behalf of CPL and

written on CAI letterhead. (Id.) Thus, the period between December 19, 2007, and January 25,

2008, was the investors' "last clear chance" to redeem their investment. (Id. ¶ 97.)

On January 31, 2008, CPL sent investors a letter, on CAI letterhead, informing

them that the Fund had lost 31% of its value on a gross basis. (Id. ¶ 107.) According to the

letter, the valuation reflected "the performance of the [F]und and the adjustment to the reserve

for the settlement of a syndicated loan trade dispute." (Id.) CPL assured investors that it

"continue[d] to have strong faith in the quality of [the Fund's] underlying positions despite these painful mark-to-market price moves." (Id.)

Beach and Kelly allege that, while CPL was assuring investors of the quality of the underlying positions, CAI and Citigroup made equity investments in a "last-ditch 'bailout' effort . . . to avoid the Fund's implosion." (Id. ¶ 109.) Despite Citigroup's investments, the Fund's NAV continued to drop. (Id. ¶ 117.) In a letter dated November 18, 2008, on CAI letterhead, CPL informed investors that a forced redemption would occur. (Id.) Ultimately, investors received three cents for each dollar initially invested. (Id. ¶ 118.)

Beach initially filed a putative class action suit on October 16, 2012. (Compl., Docket # 1.) In response to perceived jurisdictional deficiencies outlined by Pickett in a June 10, 2013, motion to dismiss, Kelly was joined as a plaintiff in a September 9, 2013, amended complaint. (See Docket # 50, 51, 63.) In the TAC, Beach and Kelly allege that through the Fund's PPM, the subscription agreement, and CPL's subsequent letters, CPL made false and misleading statements to investors regarding, inter alia, the Fund's investment strategy, the level of oversight over it, its assets, and the effects of the ProSieben transaction, which led to the loss of their investments. (TAC ¶¶ 145–50.) They further allege that CPL had a duty to disclose the terms of the ProSieben transaction and fraudulently concealed the information from investors, ultimately leading to the loss of their investments. (Id. ¶¶ 152–62.) Beach and Kelly also allege that Citigroup, CAI, and Pickett were either actively involved, or aided CPL in its actions. (Id. ¶¶ 145–62; 172–78.) Finally, Beach and Kelly allege that Citigroup, CAI, and CPL violated their duties of care, and truthfulness and candor by failing to disclose the Fund's leverage to investors, leading to the loss of their investments. (Id. ¶¶ 163–70.)

Jurisdiction is based on partial diversity of citizenship in a class action under CAFA, 28 U.S.C. § 1332(d).

## LEGAL STANDARDS

### I. Motion to Dismiss for Lack of Personal Jurisdiction

On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has personal jurisdiction over the defendant. In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003) (per curiam). "[T]he nature of the plaintiff's obligation varies depending on the procedural posture of the litigation." Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990). If the court considers only the pleadings and affidavits on the motion to dismiss, "the plaintiff need only make a prima facie showing of personal jurisdiction over defendant." CutCo Industries, Inc. v. Naughton, 806 F.2d 361, 364 (2d Cir. 1986). On a motion pursuant to Rule 12(b)(2), courts may rely upon materials that are outside the pleadings. See DiStefano v. Carozzi N. Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001).

Personal jurisdiction may be exercised over any defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Rule 4(k)(1)(A), Fed. R. Civ. P. If plaintiff is able to establish a factual predicate for jurisdiction under the laws of the forum state—here, New York—then the court must consider whether the exercise of jurisdiction violates due process. Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 94 (2d Cir. 2000).

### II. Motion to Dismiss for Failure to State a Claim

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain . . . sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In assessing a complaint, courts draw all reasonable inferences in favor of the non-movant. See Elevator Antitrust Litig., 502 F.3d at 50. Legal conclusions, however, are not entitled to any presumption of truth, and a court assessing the sufficiency of a complaint disregards them. Iqbal, 556 U.S. at 678. Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679.

   In addition to the pleading requirements of Rule 12(b)(6), a complaint alleging fraud must satisfy the heightened pleading requirements of Rule 9(b), Fed. R. Civ. P., that requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Requiring particularity serves to give a defendant notice of the plaintiff's claim and safeguards a defendant's reputation from "improvident" charges. See ATSI Comm., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). To satisfy this pleading threshold, the complaint must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000) (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)).

   "[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (quoting Mangiafico v.

Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) (quoting Chambers, 282 F.3d at 152–53)).  "[A] plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough."  Chambers, 282 F.3d at 153.  "[E]ven if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document."  DiFolco, 622 F.3d at 111 (internal quotation marks and citation omitted).

CHOICE OF LAW

The parties present arguments based on the application of New York law, the law of the forum state.  Accordingly, the Court will apply New York law.  See, e.g., Tehran-Berkeley Civil and Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir.1989) ("consent to use a forum's law is sufficient to establish choice of law").

DISCUSSION

I.   There Is No Personal Jurisdiction over CPL or Pickett.

When there are challenges made to a court's personal jurisdiction over a defendant, the Court must address them before reaching the merits of a claim.  Arrowsmith v. United Press Int'l, 320 F. 2d 219, 221 (2d Cir. 1963).  In an action brought as a class action, personal jurisdiction is based on a defendant's contacts with the forum state and actions giving rise to the named plaintiffs' causes of action.  See Selman v. Harvard Med. Sch., 494 F. Supp. 603, 613 n.6 (S.D.N.Y. 1980) (citing Mintz v. Mathers Fund, Inc., 463 F.2d 495, 499 (7th Cir. 1972)).  Contacts with unnamed class members may not be used as a jurisdictional basis, especially before a class has been certified.  Id.

- 10 -

a.  <u>CPL</u>

i.   <u>There Is No Personal Jurisdiction under CPLR § 301.</u>

Plaintiffs first invoke personal jurisdiction under New York's general jurisdiction provision, CPLR § 301.  Under CPLR § 301, a defendant may be subject to general jurisdiction by virtue of its physical presence, domicile, consent, or "doing business" in New York.  CPLR § 301, 2011 Practice Commentaries C301:2–10.

A nondomiciliary corporate defendant will only be deemed to be "doing business" in a forum when its "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State."  <u>Goodyear Dunlop Tires Operations, S.A. v. Brown</u>, 131 S. Ct. 2846, 2851 (2011).  The locations where a corporation is "at home" are, absent exceptional circumstances, limited to its principal place of business and place of incorporation. <u>Daimler AG v. Bauman</u>, 134 S. Ct. 746, 761 & n.19 (2014).  The ultimate determination as to where a corporation is "at home" "calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide."  <u>Id.</u> at 762 n.20.  Notwithstanding these limitations, a corporation may consent to jurisdiction in New York under CPLR § 301 by registering as a foreign corporation and designating a local agent.  <u>See</u> <u>Neirbo Co. v. Bethlehem Shipbuilding Corp.</u>, 308 U.S. 165, 170, 175 (1939); <u>Application of Amarnick</u>, 558 F.2d 110, 113 (2d Cir. 1977); <u>Rockefeller Univ. v. Ligand Pharm. Inc.</u>, 581 F. Supp. 2d 461, 466 (S.D.N.Y. 2008).

CPL is incorporated under the laws of the United Kingdom with its principal place of business there and is not registered to do business in New York.  (<u>See</u> TAC ¶ 31.)  It has no office or employees in New York, or any other systematic and continuous presence here. (<u>See</u> <u>id.</u>)  It therefore does not have a domicile or physical presence in the state.  The TAC alleges that actions were taken on the Fund's behalf outside of the United States and communication with investors in the United States, including one investor in New York.  (<u>See</u>

- 11 -

TAC ¶ 141.)  These communications are not sufficient, in context, to render CPL "at home" in New York for jurisdictional purposes.

Beach and Kelly assert that CPL was a "mere alter-ego" of Citigroup, its parent company.  They argue that because Citigroup is a New York-based company and subject to jurisdiction here, CPL is also subject to jurisdiction.  A finding of personal jurisdiction on an alter-ego theory requires an analysis analogous to piercing the corporate veil.  See Goodyear Dunlop Tires Operations, S.A., 131 S. Ct. at 2857.

Piercing the corporate veil requires an examination of the internal affairs of a corporation.  "Questions relating to the internal affairs of corporations—for profit or not-for-profit—are generally decided in accordance with the law of the place of incorporation . . . ." United States v. Funds Held ex rel. Wetterer, 210 F.3d 96, 106 (2d Cir. 2000).  Accordingly, the Court looks to the laws of the United Kingdom, CPL's place of incorporation, to determine whether CPL was an alter-ego of Citigroup for jurisdictional purposes.

Under United Kingdom law, "it is appropriate to pierce the corporate veil only where special circumstances exist indicating that it is a mere façade concealing the true facts." Woolfson v. Strathclyde Reg'l Council, [1978] S.L.T 159 (H.L.) 161 (appeal taken from Scot.). This limited principle, designed to prevent abuses of the corporate form, applies "when a person is under an existing legal obligation or liability or subject to an existing legal restriction which he deliberately evades or whose enforcement he deliberately frustrates by interposing a company under his control." Petrodel Resources Ltd. v. Prest, [2013] UKSC 34, [35] (appeal taken from Eng.).

Beach and Kelly allege that CPL was an alter-ego of CAI and Citigroup because (1) CPL was a subsidiary of Citigroup, (2) CAI and Citigroup exercised oversight of CPL's

management of the Fund, and (3) CPL and CAI shared corporate officers. (TAC ¶¶ 31, 45, 51, 62.) The facts alleged are consistent with a traditional relationship between a parent company and a subsidiary and are not sufficient to give rise to an inference that Citigroup abused the corporate form or used it to intentionally evade legal obligations or restrictions.

Therefore, plaintiffs have not made a <u>prima facie</u> showing that this Court has personal jurisdiction over CPL under CPLR § 301.

### ii.   CPL Did Not Consent to Jurisdiction in This Action

Beach and Kelly assert that the forum selection clauses of their subscription agreements create jurisdiction over CPL.  When parties contractually select a forum, they consent, in advance, to personal jurisdiction in that forum.  <u>D.H. Blair & Co. v. Gottdiener</u>, 462 F.3d 95, 103 (2d Cir. 2006).  CPL argues that, as a non-signatory to the subscription agreements, which are between individual investors and the Fund, the forum selection clause is not binding on it and therefore does not confer jurisdiction.

The Court assumes, without deciding, that the forum selection clauses present in Beach and Kelly's subscription agreements are binding on CPL.  The clauses state that "[t]he courts of the State of New York" have exclusive jurisdiction over actions relating to the Fund. (Soloway Decl. Ex. 3, at 7; Tom Decl. Ex. 1, at 8.)  Beach and Kelly assert that this clause provides for jurisdiction "in New York."  However, the clause provides for jurisdiction in "courts of the State of New York," rather than "courts in the State of New York."  Though the Second Circuit has not decided the issue, a majority of courts have held that "[t]he courts of" a state refers only to state courts, and not to state and federal courts.  <u>E.g.</u>, <u>New Jersey v. Merrill Lynch & Co.</u>, 640 F.3d 545, 548–49 (3d Cir. 2011) ("We further note, as did the District Court, that the vast majority of our sister circuits have held that forum selection clauses like the one at issue here required remand to the state court."); <u>LFC Lessors, Inc. v. Pac. Sewer Maint. Corp.</u>, 739

F.2d 4, 7 (1st Cir. 1984) (finding that the court "of" a state was a court whose authority "originated from" a state); Ill. Union Ins. Co. v. NRG Energy, Inc., No. 10 Civ. 5743(BSJ)(DCF), 2010 WL 5187749, at *2 (S.D.N.Y. Dec. 6, 2010) ("While this Court sits in New York, it is not 'of the State of New York.'"). But see Stateline Power Corp. v. Kremer, 148 Fed. App'x 770, 771 (11th Cir. 2005) (finding the phrase ambiguous and construing it to include both state and federal courts located within a state).

This Court agrees with the majority view. The word "of" denotes the source of a court's authority and is more than its mere location. The courts "of" a state are courts whose authority derive from that state's power. "Federal district courts may be in [a state], but they are not of [that state]." Merrill Lynch & Co., 640 F.3d at 549 (quoting Dixon v. TSE Int'l Inc., 330 F.3d 396, 398 (5th Cir. 2003) (per curiam)) (emphasis and modification in original).

Beach and Kelly did not initially file in state court and instead brought action in this Court. Under New York law, when a party brings suit in a forum not explicitly authorized by a forum selection clause, it waives any jurisdictional argument it may have had based on the clause. Ill. Union Ins. Co., 2010 WL 5187749, at *2 ("Because Plaintiffs failed to file suit in the forum specifically provided for in the policy, the forum selection clause does not support allowing the case to proceed before this Court, and is far from determinative on the issue of the convenience of the parties."); Pirolo Bros. v. Angelo Maffei and Figli, SAS, No. 87 CIV. 7561 (MBM), 1989 WL 20945, at *2 (S.D.N.Y. Mar. 2, 1989) (collecting cases). Because Beach and Kelly filed suit in federal court, in contravention of their respective forum selection clauses, the clauses may not be used as a basis to find that CPL consented to jurisdiction in this District. Though it is possible that other unnamed class members' subscription agreements specified

- 14 -

federal and state courts in New York as suitable forums, this theoretical possibility does not supply jurisdiction here.  See Selman, 494 F. Supp. at 613 n.6.

### iii.  There Is No Personal Jurisdiction under CPLR § 302.

Beach and Kelly also assert jurisdiction by reason of (1) CPL's actions relating to its management of the Funds as alleged in the TAC, (2) its actions causing harm in New York, and (3) its use of a New York-based agent to perform back-office functions relating to the Funds.

First, the TAC alleges that CPL provided numerous fraudulent reports to investors as to the Fund's overall health and investment strategy, thereby inducing them to invest in, and forebear from redeeming investments in, the Fund.  (See TAC ¶ 146, 149.)  The TAC further alleges that CPL fraudulently concealed the ProSieben transaction from investors.  (Id. ¶¶ 156–59.)  Finally, the TAC alleges that CPL negligently provided Beach and Kelly false information regarding the Fund's portfolio, in violation of its duty of truthfulness and candor.  (Id. ¶¶ 165–68.)

CPLR § 302, New York's long-arm jurisdiction statute, authorizes the exercise of personal jurisdiction over nondomiciliaries under circumstances that will be discussed.  Under CPLR § 302(a)(2), courts have jurisdiction over nondomiciliaries who commit a tortious act within the state.  New York courts have long interpreted "a tortious act within the state" to require a defendant, or its agent, to be physically present in New York when committing the act. See Pincione v. D'Alfonso, 506 F. App'x 22, 25 (2d Cir. 2012); Bensusan Rest. Corp. v. King, 126 F.3d 25, 28–29 (2d Cir. 1997).  In cases involving misrepresentations committed out of state, courts have recognized a limited "original event" exception where a plaintiff's initial reliance, or other first event causing a plaintiff's harm, occurred in New York, even when the defendant was not physically present.  See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 792 (2d Cir. 1999).

Thus, in order for CPL's allegedly fraudulent statements to provide a basis of jurisdiction under CPLR § 302(a)(2), they must either have been sent from New York, or have been received in New York. The TAC asserts that CPL sent letters, all signed by Micko, as well as monthly performance reports, containing allegedly misleading information to the Fund's investors. (See TAC ¶¶ 90–109.) The TAC further alleges that the letters were on CAI letterhead. (Id. ¶¶ 90, 105, 107, 112.) Of the letters, only the first, dated December 17, 2007, has been submitted as an exhibit. (See Soloway Decl. ¶ 5.) This letter, bearing a CAI letterhead, lists CAI's address as being in London. (Id.) The London address on the letterhead gives rise to the inference that Micko sent the letter from his office in London. (See Soloway Decl. Ex. 4, at 1.) Because the letters were signed by Micko, who worked in CAI's London office, the Court infers, and the TAC does not state otherwise, that all the letters sent by CPL on CAI letterhead were sent from London.

The TAC further asserts that the CPL letters were sent to "the Fund's investors," here, the named plaintiffs. (See TAC ¶ 90.) It does not allege that Beach and Kelly received the letters in New York, as opposed to receiving them at their residences. Accordingly, the Court infers that Beach and Kelly received their copies at their residences in the United Kingdom and New Jersey, respectively.

Second, Beach and Kelly argue that CPL's actions caused harm in New York. Under CPLR § 302(a)(3), a court may assert jurisdiction over a foreign defendant whose actions cause harm in New York. "When an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." Global Fin. Corp. v. Triarc Corp., 93 N.Y.2d 525, 529 (1999). Thus, because the TAC only alleges economic harm, the Court infers that plaintiffs' alleged injuries took place at their residences in

the United Kingdom and New Jersey.  To establish harm in New York, Beach and Kelly assert

that the Fund itself was a New York-based fund, CPL's actions relating to the ProSieben

transaction caused it harm, and this harm led directly to their alleged injuries.

      To support their allegation that the Fund was based in New York, Beach and

Kelly assert that the Fund was a "mere alter-ego" of Citigroup and CAI, which are both based in

New York.  As with a finding of presence for jurisdictional purposes through a corporate parent,

a finding of corporate presence through the presence of a parent company to find local harm

requires an inquiry analogous to piercing the corporate veil.  See Goodyear Dunlop Tires

Operations, S.A., 131 S. Ct. at 2857.  In order to determine whether the Fund was an alter-ego of

CAI, its parent company, the Court looks to the law of the Cayman Islands, the Fund's place of

incorporation.  See Funds Held ex rel. Wetterer, 210 F.3d at 106.

      Under Cayman Islands law, courts may only pierce the corporate veil "in

exceptional cases" where "special circumstances exist indicating that [the corporate form] is a

mere façade concealing the true facts." Walker Int'l Holdings Ltd. v. Olearius Ltd., [2003] CILR

457 (Grand Ct.) [471–72].  Traditionally, exceptional circumstances have been found when a

company (1) engages in conduct that is illegal, or ultra vires the company, (2) perpetrates a fraud

against the minority shareholders and the wrongdoers are themselves in control of the company,

or (3) passes a resolution which requires a qualified majority by a simple majority.  Gee v.

Attridge, [1986-87] CILR 343 (Grand Ct.) [347]  (internal quotation marks and citations

omitted).

      Beach and Kelly argue that the Fund was CAI's alter ego because (1) CAI

appointed Fund directors, (2) CAI and Citigroup provided oversight of the Fund's investments,

(3) the Fund was advertised as an "investment department" of CAI, and (4) CAI representatives

in New York acted as agents for the Fund.  (TAC ¶¶ 47–52.)  The facts alleged are consistent with a traditional relationship between a parent company and a subsidiary and are not sufficient to give rise to an inference that CAI abused the corporate form or used it as a façade to conceal its relationship with the Fund.  Therefore, the Court concludes that the Fund was based in the Cayman Islands, and not in New York.

Assuming, arguendo, that plaintiffs' alleged injuries were caused by the same events that caused injury to the Fund, there would still not be a sufficient basis for finding jurisdiction over CPL in the instant action.  To link plaintiffs' harm to the harm suffered by the Fund for CPLR § 302 purposes, Beach and Kelly must show their harm "arose out" of the same acts as caused the Fund's harm.  "New York courts have held that a claim arises from a particular transaction when there is some articulable nexus between the business transacted and the cause of action sued upon, or when there is a substantial relationship between the transaction and the claim asserted."  Solé Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 103 (2d Cir. 2006) (internal quotation marks and citation omitted).  This inquiry is fact-specific. Id.

Here, the Fund's hypothetical claims stem from the ProSieben transaction, which allegedly caused the Fund to be over-leveraged and subsequently collapse.  (TAC ¶¶ 78, 113.) The TAC alleges that the PPM and CPL's subsequent communications "induced [Beach and Kelly] to invest in the Funds and/or forbear from redeeming their investments in the Funds." (See id. ¶ 150.)  It further alleges that, but for CPL's communications to investors, Beach and Kelly would not have initially invested in the Fund and, subsequently, would have sought to rescind their investments in the Fund.  (Id. ¶¶ 73, 88.)  Thus, the TAC alleges that CPL's failure

to disclose the possibility of risky investments and lack of oversight generally, and the ProSieben investment specifically, caused plaintiffs' injuries.

According to the TAC, the ProSieben transaction was consummated by CPL at its headquarters in the United Kingdom, concerning debt owed by a German television provider, on behalf of a fund registered in the Cayman Islands; no part of the transaction, as alleged, has a connection to New York.  (See TAC ¶¶ 31–32, 74; Soloway Decl. Ex. 2, at 18; Tom Decl. Ex. 2, at 7.)  Therefore, the Court concludes that the ProSieben transaction, as alleged, did not cause harm in New York.

The TAC does allege that some investors in New York received CPL's allegedly fraudulent communications.  (See id. ¶ 141.)  Though these investors may have received identical letters to those Beach and Kelly received, those communications are separate from the communications to Beach and Kelly and may not be said to have caused their injuries.  See In re Parmalat Sec. Litig., 477 F. Supp. 2d 602, 611 (S.D.N.Y. 2007).

Therefore, the Court concludes that Beach and Kelly's claims do not arise out of a transaction that caused harm in New York.

Finally, Beach and Kelly argue that the Fund transacted business in New York through its fund administrator and other back office services.  Under CPLR § 302(a)(1), courts may exercise jurisdiction over defendants for harm arising out of business conducted in New York.  Beach and Kelly identify the Fund administrator, GlobeOp LLC, which provided CPL with administrative and back office functions, as a Delaware entity based in New York.  (TAC ¶ 24.)  Citing the PPM, they further assert that CPL calculated the Fund's NAV, which was sent to investors, in New York.

But the PPM identifies the Fund administrator as "GlobeOp Financial Services (Cayman) Limited, whose principal office is at . . . Grand Cayman, Cayman Islands . . . ." (Soloway Decl. Ex. 2, at 37; Tom Decl. Ex. 2, at 26.)  Based on the PPM, and the absence of any detail in the TAC for the claim that GlobeOp LLC is based in New York, the Court infers that the Fund administrator was a Cayman Islands company with its principal place of business there.

Beach and Kelly assert that the fund administrator computed the NAV in New York.  According to the PPM, the NAV was "determined at the close of business in New York on or as of each Valuation Day or at such other times as the Directors may determine." (Soloway Decl. Ex. 2, at 51; Tom Decl. Ex. 2, at 40.)  By the plain language of the PPM, the phrase "close of business in New York" refers to a time and not a location.  As such, the TAC alleges that the NAV was computed by the Fund administrator, at its place of business, as part of its agreement with the Fund.  (See Soloway Decl. Ex. 2, at 37–38; Tom Decl. Ex. 2, at 26–27.)

Accordingly, the Court concludes that the TAC alleges that CPL's administrative and back office functions took place in the Cayman Islands, and not in New York.

Plaintiffs have not made a prima facie showing that this Court has jurisdiction over CPL under CPLR § 302.

b.  Pickett

Pickett is a resident of London and does not maintain a residence in this District. (See Pickett Decl. ¶¶ 2, 7.)  Beach and Kelly do not allege that Pickett was present in this District at any relevant time but argue that this Court has jurisdiction over Pickett through his actions as CPL's CEO.  Because those actions, as alleged, do not create a basis for jurisdiction over CPL, they necessarily do not create a basis for jurisdiction over Pickett.  See Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 468 (1988).

Beach and Kelly also assert that Pickett is subject to personal jurisdiction through this Court's jurisdiction over Citigroup and CAI as "co-conspirators." "Courts in this Circuit have recognized this conspiracy theory of personal jurisdiction, which allows the acts of a co-conspirator to be attributed to a defendant for the purpose of obtaining personal jurisdiction over the defendant." In re Satyam Computer Servs. Ltd. Sec. Litig., 915 F. Supp. 2d 450, 484 (S.D.N.Y. 2013) (internal quotation marks and citation omitted); Singer v. Bell, 585 F. Supp. 300, 302–03 (S.D.N.Y. 1984) (Weinfeld, J.) (collecting cases). To establish personal jurisdiction over a nondomiciliary under a this theory, a plaintiff must "(1) make a prima facie factual showing of a conspiracy, (2) allege specific facts warranting the inference that the defendant was a member of the conspiracy, and (3) set forth evidentiary facts to connect the defendants with transactions occurring in [New York]." In re Satyam Computer Servs. Ltd. Sec. Litig., 915 F. Supp. 2d at 484.

Pickett's alleged liability under this theory stems from his involvement in drafting fraudulent communications that CPL allegedly sent from its office in London to the plaintiffs. Beach and Kelly assert that these communications were drafted, in part, by Citigroup and CAI in New York with Pickett's help. However, the PPM and Fund subscription agreements make no reference the drafting parties. (See Soloway Decl. Ex. 2, Ex. 3; Tom Decl. Ex. 1, Ex. 2.) The TAC references the PPM as being associated with the Fund, but never alleges an author. (See TAC ¶¶ 41, 54.) As such, the TAC does not plausibly allege that any part of the PPM was drafted in New York.

Therefore, plaintiffs have not made a prima facie showing that this Court has jurisdiction over Pickett.

    c.   <u>Plaintiffs' Request for Limited Jurisdictional Discovery Is Denied.</u>

Beach and Kelly request limited jurisdictional discovery on four issues—(1) the extent Pickett interacted with Citigroup and CAI in New York, (2) the extent that the Fund transacted business in New York, (3) whether Pickett used e-mail servers or document servers in New York, and (4) the extent the offering documents were drafted in New York. Of the four issues listed, only additional information on the fourth would potentially have an impact on whether jurisdiction over CPL and Pickett existed. Beach and Kelly's claims arise out of the PPM and CPL's communications to investors subsequent to the ProSieben transaction. Whether CPL purchased other securities, or sent communications to New York, on the Fund's behalf, though related, is not relevant to the question of whether the conduct leading directly to plaintiffs' alleged injuries had a connection to New York. See <u>Solé Resort, S.A. de C.V.</u>, 450 F.3d at 103.

The extent that the offering documents were drafted in New York is directly related to Beach and Kelly's conspiracy theory of jurisdiction. "[I]n a case where the plaintiff has submitted evidentiary facts tending to connect the defendant to New York transactions, the conspiracy/jurisdictional issue should not be resolved and the complaint dismissed without discovery." <u>Emerald Asset Advisors, LLC v. Schaffer</u>, 895 F. Supp. 2d 418, 433 (E.D.N.Y. 2012) (quoting <u>Sierra Rutile Ltd. v. Katz</u>, No. 90 Civ. 4913 (JFK), 1992 WL 236208, at *8 (S.D.N.Y. Sept. 8, 1992)). As discussed above, Beach and Kelly have not alleged facts sufficient to give rise to an inference that any of the documents were drafted, in whole, or in part, in New York. Consequently, discovery on the off chance that the documents may have been drafted here is an inappropriate fishing expedition. <u>See</u> <u>Best Van Lines, Inc. v. Walker</u>, 490 F.3d 239, 255 (2d Cir. 2007).

Beach and Kelly's request for jurisdictional discovery is denied.

II. <u>Citigroup and CAI's Motion to Dismiss Is Granted in Part and Denied in Part.</u>

Citigroup and CAI argue that the TAC fails to state claims for fraud, fraudulent concealment, aiding and abetting fraud, negligent misrepresentation, and that some of Kelly's fraudulent misrepresentation claims are time-barred.

   a.   <u>Fraud</u>

Under New York law, to state a claim for fraud, a plaintiff must allege "that [1] the defendant knowingly or recklessly misrepresented a material fact, [2] intending to induce the plaintiff's reliance, and that [3] the plaintiff relied on the misrepresentation and [4] suffered damages as a result." <u>Merrill Lynch & Co. v. Allegheny Energy, Inc.</u>, 500 F.3d 171, 181 (2d Cir. 2007).

In the TAC, Beach and Kelly allege that the defendants made fraudulent statements to Fund investors through CAI's marketing materials, the PPM, the Fund subscription agreements, and CPL's communications to investors after the ProSieben transaction. (<u>See</u> TAC ¶¶ 62, 146.)

   i.   <u>CAI's Marketing Materials</u>

According to the TAC, Fund investors were "permitted" to rely on CAI's representations found in its marketing materials. (TAC ¶ 73.) However, the TAC does not allege that Beach and Kelly relied on these materials in making their investments. (<u>See id.</u> ¶¶ 27–28.) Even if they had relied on the marketing materials, their reliance would not have been justified. In order to invest in the Fund, Beach and Kelly were required to warrant that they had relied solely on the PPM and their own independent investigations. (Soloway Decl. Ex. 3, at 3; Tom Decl. Ex. 1, at 4.) Beach and Kelly further warranted that they did not rely on "the Fund, the Investment Manager, the Administrator, the Placement Agent, . . . , or any other person or entity" in making their decisions to invest. (Soloway Decl. Ex. 3, at 3; Tom Decl. Ex. 1, at 4.)

Consequently, allegations that CAI's marketing materials, other than the PPM, were misleading are not sufficient to state a claim of fraud.  See Brown v. E.F. Hutton Grp., Inc., 991 F.2d 1020, 1032–33 (2d Cir. 1993).

ii.   The PPM and Subscription Agreements

Beach and Kelly argue that, though they have not alleged that Citigroup and CAI directly drafted the PPM or subscription agreements, authorship may be imputed to them through the group pleading doctrine.  Under the group pleading doctrine, allegedly fraudulent statements in the PPM may be imputed to "insiders or affiliates" of the Fund, as long as the plaintiffs sufficiently allege interaction between the affiliates and the Fund.  See Oukanine v. MacFarlane, 897 F.2d 75, 80 (2d Cir. 1990); In re Optimal U.S. Litig., 837 F. Supp. 2d 244, 263–64 (S.D.N.Y. 2011).

According to the TAC, Citigroup and CAI represented to investors that they exercised supervisory authority over CPL's management of the Fund.  (TAC ¶¶ 44, 62; Soloway Decl. Ex. 2, at 75.)  The allegations of the TAC, when taken together, are sufficient to create an inference that Citigroup and CAI reviewed the PPM and subscription agreements.  See DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1248–49 (2d Cir. 1987); In re Optimal U.S. Litig., 837 F. Supp. 2d at 264.

Beach and Kelly allege that statements made in the PPM, incorporated by reference into the subscription agreements, were false and misleading because they did not adequately disclose the Fund's potential use of leverage and because CAI and Citigroup did not actually monitor the Fund's risk.  (TAC ¶¶ 56, 73.)  Beach and Kelly explain that, though the potential use of leverage was disclosed in the PPM, the warning was insufficient because it was "buried among other boilerplate disclosures."  (Id. ¶ 56.)  They further assert that, though the

- 24 -

PPM stated that Citigroup would monitor CPL's activities, there was no actual oversight over CPL or the Fund, or independent risk management.  (TAC ¶¶ 61, 63, 73.)

In order for the representations in the PPM to give rise to a cause of action, the TAC must allege that Citigroup and CAI either knew, or recklessly disregarded the possibility that the representations were false when made.  See Allegheny Energy, Inc., 500 F.3d at 181. Subsequent developments, in isolation, are not sufficient to state a cause of action for fraudulent misrepresentation.  See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 494 (S.D.N.Y. 2004); Nat'l Westminster Bank USA v. Weksel, 511 N.Y.S.2d 626, 629 (1st Dep't 1987).  However, subsequent developments may constitute circumstantial evidence of an intent to deceive at the time a statement was made, contributing to a "strong inference of scienter."  See ATSI Commc'ns, Inc. v. Shaar Fund, Inc., 493 F.3d 87, 99 (2d Cir. 2007).  "For an inference of scienter to be strong, a reasonable person must deem it cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Id. (internal quotation marks and citations omitted) (emphasis in original).

Beach and Kelly state that the PPM's representations were false in light of the subsequent ProSieben transaction, which violated the Fund's internal controls and showed that leverage was a "central aspect of the Fund's investment strategy."  (Id. ¶¶ 56, 78, 88, 104.)  They further state that the ProSieben transaction was deliberately hidden from the risk managers at CAI and violated the Fund's internal trading limits.  (Id. ¶¶ 77–78.)  The TAC also alleges that, despite knowing about the irregularities, Citigroup and CAI forced CPL to consummate the transaction.  (See id. ¶¶ 82, 87.)

Though no single action alleged in the pleading gives rise to an inference of fraudulent intent, when viewed as a whole, the facts alleged plausibly give rise to a strong

inference that Citigroup and CAI had no intention of monitoring the Fund's risk profile. The facts alleged do not, however, plausibly give rise to a strong inference that Citigroup and CAI knew that the Fund would be overleveraged at some point in the future.

Therefore, the TAC plausibly alleges that the PPM misrepresented Citigroup and CAI's involvement in monitoring the Fund's risk profile and CPL's actions.

### iii. Communications Subsequent to the ProSieben Transaction

According to the TAC, all communication regarding Pickett's departure and the ProSieben investment was signed by "Micko for CPL" and sent on CAI letterhead. (TAC ¶ 107.) Beach and Kelly assert that, because Micko was simultaneously employed by CPL and CAI, CAI is liable for his actions. Under New York law, an employer will be liable for any actions committed by employees within the scope of their employment. Riviello v. Waldron, 47 N.Y.2d 297, 302 (1979). The determination of whether an act was within the scope of employment is a mixed question of law and fact that requires "the application of a legal standard to a set of historical facts." See Cabrera v. Jakabovitz, 24 F.3d 372, 385–86 (2d Cir. 1994). Among the facts to be considered are: "the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated." Riviello, 47 N.Y.2d at 303. "The ultimate determination of this issue is ordinarily for the jury, although it can be made as a matter of law in some instances." Girden v. Sandals Int'l, 262 F.3d 195, 205 (2d Cir. 2001).

Here, the TAC alleges that Micko, while he was sending communications for CPL, was an employee of both CAI and CPL and reported to CAI executives. (See TAC ¶¶ 51, 93–94.) Further, the TAC alleges that CAI viewed the Fund as "essentially an investment

department within [CAI]." (Id. ¶ 49.)  As such, it is plausible that, because CAI had an interest in CPL and the Fund, Micko was acting on behalf of both CPL and CAI when he sent communications to investors, even though he only signed the letters for CPL.  However, the TAC does not allege any employment relationship between Micko and Citigroup.  Therefore, Micko's statements may plausibly be attributed to CPL and CAI, but not Citigroup.  Consequently, the TAC does not adequately allege fraud claims against Citigroup arising out of Micko's communications to investors.

Beach and Kelly assert that Micko made fraudulent statements to investors when he wrote that the Fund's portfolio was "fundamentally sound" while withholding material information concerning the Fund's overall health in light of the ProSieben transaction.  (Id. ¶¶ 88, 91, 95.)  Beach and Kelly further assert that, had they been aware of the ProSieben transaction, they would have sought to rescind their investments before CPL suspended all redemptions.  (See id. ¶¶ 88.)

Citigroup and CAI argue that Beach and Kelly's claims must fail as a matter of law because New York does not recognize "holder" claims.  "A 'holder' claim is one 'in which the plaintiffs allege that material misrepresentations or omissions caused them to retain ownership of securities that they acquired prior to the alleged wrongdoing.'"  Matana v. Merkin, 957 F. Supp. 2d 473, 490 (S.D.N.Y. 2013) (quoting In re WorldCom, Inc. Sec. Litig., 336 F. Supp. 2d. 310, 318–23 (S.D.N.Y. 2004)) (emphasis in original).  Though the New York Court of Appeals has not ruled on the issue, New York courts have traditionally recognized holder claims as cognizable causes of actions.  See AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 212–13 (2d Cir. 2000); Weinberger v. Kendrick, 698 F.2d 61, 78 (2d Cir. 1982) ("[Under] rule of New York law whereby persons who merely held Grant securities would have been permitted to

show reliance by proving that defendants' alleged misrepresentations and nondisclosures caused them to hold securities they would otherwise have sold."); Continental Ins. Co. v. Mercadante, 225 N.Y.S. 488, 493–94 (1st Dep't 1927). However, a recent decision by the First Department has called the continued viability of such claims into question. See Starr Found. v. Am. Int'l Grp., 901 N.Y.S.2d 246, 257 (1st Dep't 2011) (Moskowitz, J., dissenting) ("Without admitting it, the majority in effect does away with most holder claims.").

In Starr Foundation, the plaintiffs alleged that the defendants fraudulently induced them to continue to hold, rather than sell, a portion of common stock of a publically traded security. Id. at 247 (majority opinion). Applying New York's "out-of-pocket" rule, "under which the true measure of damages for fraud is indemnity for the actual pecuniary loss sustained as the direct result of the wrong," the court found the claim to be too speculative to warrant relief, and characterized it as "virtually the paradigm of the kind of claim that is barred by the [rule]". Id. at 248–49 (internal citations and quotation marks omitted). Comparing the plaintiff's claim with a "typical" fraud claim, the court reasoned:

> In the case of a holder claim seeking damages based on the value that would have been realized in a hypothetical sale, however, the degree of speculation in determining damages is essentially quadrupled, in that the factfinder must determine (1) whether the claimant would have engaged in a transaction at all if there had been accurate disclosure of the relevant information, (2) the time frame within which the hypothetical transaction or series of transactions would have occurred, (3) the quantity of the security the claimant would have sold, and (4) the effect truthful disclosure would have had on the price of the security within the relevant time frame. These cumulative layers of uncertainty amount to a difference in the quality, not just the quantity, of speculation, and take the claim out of the realm of cognizable damages.

Id. at 250.

Though the court questioned <u>Mercadante</u>'s "continuing vitality," it went on to distinguish the claims at issue with the claims in <u>Mercadante</u> noting that, unlike the <u>Starr Foundation</u> plaintiffs, "the <u>Mercadante</u> plaintiffs did suffer an out-of-pocket loss, specifically, the loss of their investment." <u>See</u> <u>id.</u> at 252.

Since <u>Starr Foundation</u> was decided, state and federal courts applying New York law have split on the question of whether the decision forecloses all holder claims, or only holder claims alleging hypothetical lost profits. <u>See</u> <u>In re Bear Stearns Cos., Sec., Derivative, & ERISA Litig.</u>, No. 13 Civ. 2692, 2014 WL 463582, at *20 (S.D.N.Y. Feb. 5, 2014) ("Given the uncertainty of the New York law with respect to holder claims, Judge Moskowitz's views in his dissent in <u>Starr</u> on the current state of holder claims in New York is most persuasive . . . ."); <u>Matana</u>, 957 F. Supp. 2d at 491 (noting that, though <u>Starr</u> could be read as precluding holder claims, it also assumed the continuing validity of <u>Mercadante</u>); <u>Irvin v. Jones, Little & Co., CPAs, LLP</u>, 2012 NY Slip Op 52337(U), 29 (Sup. Ct. N.Y. County 2012) ("[T]he court finds that to the extent that such cause of action may be read as asserting 'holder' claims . . . such claims are not actionable under New York law."); <u>ASR Levensverzekering NV v. Swiss Re Fin. Prods.</u>, No. 650557/2009, slip op. at 11 (Sup. Ct. N.Y. County Oct. 17, 2011) ("While the <u>Starr</u> Court cast doubt on the 'continuing vitality of <u>Mercadante</u>,' the Court did not overrule it, and this Court remains bound by it." (citing <u>Starr Found.</u>, 901 N.Y.S.2d at 252)), <u>aff'd sub nom.</u> <u>ASR Levensverzekering NV v. Breithorn ABS Funding P.L.C.</u>, 958 N.Y.S.2d 380 (1st Dep't 2013).

Absent a contrary indication from the New York Court of Appeals, the Court tentatively concludes that holder claims of the particular type alleged here are still viable under New York law; this Court may revisit this issue at the summary judgment stage or trial. As the First Department noted, <u>Starr Foundation</u> concerned a claim for lost profits, which were

speculative, rather than the loss of an entire investment.  See Starr Found., 901 N.Y.S.2d at 252.

Furthermore, the First Department subsequently characterized the rule articulated by Starr

Foundation as prohibiting "recovery of profits which would have been realized in the absence of

fraud." Tradex Global Master Fund SPC LTD v. Titan Capital Grp. III, LP, 944 N.Y.S.2d 527,

529 (1st Dep't 2012) (emphasis added).

       Thus, in order to sustain a valid holder claim under Starr Foundation and

Mercadante, a plaintiff must show actual damages.  This may be done by alleging (1) the loss of

substantially the entire investment, (2) whether the plaintiff would have sought to rescind the

investment, had there been an accurate disclosure of the relevant information, (3) the time frame

within which the rescission would have occurred, (4) the portion of the investment that would

have been sold, and (5) the effect truthful disclosure would have had on the value of the

investment.  See Starr Found., 901 N.Y.S.2d at 250, 252; Mercadante, 225 N.Y.S. at 490, 494.

       Here, Beach and Kelly assert that, had they known about the ProSieben

transaction, they would have sought to redeem their entire investment in the Fund.  (TAC ¶ 88.)

They further assert that their "last clear chance" to divest of the Fund was between December 19,

2007, and January 25, 2008.  (TAC ¶ 97.)  Finally, they assert the loss of their entire investment.

(TAC ¶¶ 118, 132.)  The Court finds these allegations are sufficient at the pleading stage in that

they assert a time that the investment would have been redeemed, the portion of the investment

that would have been redeemed, and the loss of the entire investment.  Furthermore, the PPM,

incorporated by reference to the TAC, provides a metric for the valuation of the Fund at the

relevant times.  (See Soloway Decl. Ex. 2, at 44.)  As such, Beach and Kelly's holder claim, as

pleaded, alleges a non-speculative loss, at a specific time, and is not barred by Starr Foundation.

Citigroup and CAI argue that, despite the assertion of actual loss, Beach and

Kelly's claims must fail because their investments were subject to a "Lock-Up" provision which

would have prevented them from redeeming their shares. The Court finds this argument to be

unconvincing. According to the TAC, Beach and Kelly would have been able to redeem their

shares, notwithstanding the Lock-Up provision, under the "Key Man Event" provision of the

PPM. (See TAC ¶¶ 95–97; Soloway Decl. Ex. 2, at 48.)

Therefore, the Court concludes that the TAC states a claim against CAI, but not

Citigroup, for fraudulent misrepresentation arising out of CPL's communications to investors

after the ProSieben transaction.

### iv. Kelly's Claims

Citigroup and CAI argue that Kelly's fraudulent misrepresentation claims

stemming from the PPM are time barred. For fraud claims to be timely, suit must be filed no

later than "the greater of six years from the date the cause of action accrued or two years from

the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could

with reasonable diligence have discovered it." CPLR § 213(8). When a claim alleges fraudulent

inducement of contract, the cause of action accrues when the contract is executed. Triangle

Underwriters, Inc. v. Honeywell, Inc., 604 F.2d 737, 748 (2d Cir. 1979) (internal citations

omitted) (applying New York law). Therefore, the statute of limitations on fraud claims arising

Kelly's investment based on statements in the PPM expired on February 20, 2013. (See Tom

Decl. Ex. 1, at 23.)

Kelly was added as a plaintiff in this action through an amendment under Rule

15(a), Fed. R. Civ. P., on September 9, 2013. (See Docket # 62, 63.) However, Kelly initially

signed the subscription agreement with the Fund on February 14, 2007, more than six years

before being joined as a plaintiff. (See Tom Decl. Ex. 1, at 11.) There is no dispute that, had

Kelly been initially named as a plaintiff when Beach commenced the putative class action on October 16, 2012, Kelly's claims would have been timely.

Under Rule 15(c)(1)(B), Fed. R. Civ. P., claims added through amendment will relate back to the original date of filing if the amendment "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." If the amendment changes or adds a defendant, claims relate back only if the new defendant was on notice, and knew or should have known "that the action would have been brought against it, but for a mistake concerning the proper party's identity." Rule 15(c)(1)(C), Fed. R. Civ. P. Though the Rule does not explicitly deal with the situation of joining an additional plaintiff, the 1966 Advisory Committee's Note states that claims of additional plaintiffs should be treated in a manner analogous to those of additional defendants. Rule 15, 1966 Advisory Committee's Note. Thus, a new plaintiff's claims will relate back to the initial filing date if the defendants were on notice of the claims, the defendants would not be prejudiced defending them, and the failure to initially bring the claims was due to a mistake. See Levy v. U.S. Gen. Accounting Office, 175 F.3d 254, 255 (2d Cir. 1999) (per curiam). Ultimately, the determination as to whether a claim will relate back under Rule 15(c) is a matter of law. See Slayton v. Am. Express Co., 460 F.3d 215, 227–28 (2d Cir. 2006).

The Second Circuit has not addressed whether the claims of a newly named plaintiff will relate back to the original time of filing in the class action context. In this Circuit, courts have rejected the "mistake" requirement when adding new named plaintiffs in a class action and focus on whether the new plaintiff's claims were reasonably foreseeable and whether their addition would prejudice the defendants. In re Simon II Litig., 211 F.R.D. 86, 146 (E.D.N.Y. 2002) ("The addition of new plaintiffs will not be permitted if their addition would

surprise and frustrate reasonable possibilities for a defense."), vacated on other grounds 407 F.3d

125 (2d Cir. 2005); In re S. African Apartheid Litig., 617 F. Supp. 2d 228, 290 (S.D.N.Y. 1999)

(discussing cases and noting that when a new plaintiff's claims arise out of similar facts and

circumstances already pleaded, allowing relation back would be consistent with the liberal

"attitude" of Rule 15(c)).

　　　　　When a complaint is filed as a putative class action, an action is commenced "for

all members of the class as subsequently determined." Am. Pipe & Constr. Co. v. Utah, 414

U.S. 538, 550 (1974). Thus, all class members, named and unnamed, are parties to the action

"until and unless they received notice thereof and chose not to continue." Id. at 550–51. Prior to

class certification, and throughout the pendency of a class action, a named plaintiff must be able

to "fairly and adequately" protect the interests of the class. See O'Shea v. Littleton, 414 U.S.

488, 494 (1974); Rule 23(a), Fed. R. Civ. P.

　　　　　In some circumstances, it may come to pass that a named plaintiff, who, before

class certification, loses standing to bring a claim. This may be due to changed circumstances,

death, or another intervening event. Should this occur, the entire action ordinarily becomes

unsustainable. See Sudler v. City of New York, 689 F.3d 159, 179 (2d Cir. 2012). To prevent

dismissal, an absent class member, depending upon the state of the case and other considerations,

may be substituted for the inadequate named plaintiff, becoming a new named plaintiff in the

process. See Shahriar v. Smith & Wollensky Rest. Grp., Inc., 659 F.3d 234, 253 (2d Cir. 2011).

　　　　　When an action is filed as a putative class action, defendants are on notice as to

the extent and nature of the claims. As such, allowing relation back of the newly named

plaintiff's claims under Rule 15(c), as long as they are identical to the claims already asserted

and would have been timely at the time of filing, would not unduly surprise or prejudice the defendants.[1]

The instant action was initially filed as a putative class action. (See Compl. ¶ 1.) At that time, Kelly was an unnamed class member and therefore an unnamed party to the action. As such, Kelly's claims, which were timely at the time of filing, will relate back as long as they do not raise any new substantive issues or unfairly prejudice Citigroup and CAI. When Kelly was added as a named plaintiff in the TAC, the allegations, which were framed with respect to the entire class, and not just Beach, remained substantially the same. (See TAC ¶¶ 146–48, 159–61.) Furthermore, the TAC only references Kelly by name once, as a party to the litigation and consistently refers to Beach and Kelly collectively as "Plaintiffs." (See, e.g., TAC ¶¶ 28, 54, 63.)

Consequently, the Court finds that Kelly's addition as a named plaintiff would neither change the nature of the action, nor would it prejudice or "surprise" CAI and Citigroup. The Court further notes that, should Kelly's claims be dismissed as time barred based on his change of status, and should the Court certify the class, Kelly would be foreclosed from recovering as a class member, which would be inequitable. See Rule 41(b), Fed. R. Civ. P. Therefore, the Court concludes Kelly's claims relate back to the time of filing under Rule 15(c)(1)(B), Fed. R. Civ. P. As such, the claims are timely and CAI and Citigroup's motion to dismiss them is denied.

b. Fraudulent Concealment

Beach and Kelly assert that Citigroup and CAI fraudulently concealed the ProSieben investment from Fund investors. In order to sustain a claim of fraudulent

---

[1] The Court notes that the conclusion reached in this case is consistent with reasoning in both the Third Circuit and the Seventh Circuit. See In re Cmty. Bank of N. Va., 622 F.3d 275, 297–98 (3d Cir. 2010); Phillips v. Ford Motor Co., 435 F.3d 785, 787–88 (7th Cir. 2006).

concealment under New York law, a plaintiff must show that the defendant had a duty to disclose material information.  Lerner v. Fleet Bank, N.A., 459 F.3d 273, 291–92 (2d Cir. 2006). Usually, a duty to disclose may arise where the parties have a fiduciary relationship, or, during the course of a business relationship, "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." See id. at 292 (internal quotation marks and citations omitted); Cobalt Partners, L.P. v. GSC Capital Corp., 944 N.Y.S.2d 30, 36 (1st Dep't 2012).

Beach and Kelly assert that CAI and Citigroup had a fiduciary relationship with Fund investors by virtue of their relationships with CPL and the Fund.  To support this assertion, they argue that CAI and Citigroup, as parent corporations of the Fund and CPL, respectively, assumed the fiduciary responsibilities of their subsidiaries.  Absent a contractual or legal obligation, a subsidiary's fiduciary duties will not be imputed to its corporate parent.  See id. at 35–36.  However, when a corporate parent actively controls a subsidiary to the extent that the subsidiary can no longer be considered to be independently managed, then the parent will be deemed to have assumed the subsidiary's fiduciary duties as its manager.  See Balance Return Fund Ltd. v. Royal Bank of Can., 921 N.Y.S.2d 38, 39–40 (1st Dep't 2011); Guerrand-Hermès v. J.P. Morgan & Co., 769 N.Y.S.2d 240, 242–43 (1st Dep't 2003).

According to the TAC, Pickett and CPL were responsible for the day-to-day management of the Fund, including choosing Fund investments and communicating with investors.  (TAC ¶¶ 31–32.)  Though the TAC alleges that CAI and Citigroup provided "oversight" of the Fund, the only actions alleged directly attributable to CAI and Citigroup are that they forced Pickett to consummate the ProSieben transaction and, later, fired Pickett and replaced him with Micko.  (See id. ¶¶ 47, 82–83, 92–93.)  These actions are not sufficient to

plausibly infer that they actively managed either CPL or the Fund at a level sufficient to become their de facto managers.  As such, the TAC fails to plausibly allege that Citigroup and CAI had a duty to disclose information concerning the Fund's condition to investors.

Therefore, Beach and Kelly's fraudulent concealment claims are dismissed.

### c.  Negligent Misrepresentation

Under New York law, in order to sustain a claim for negligent misrepresentation, a plaintiff must show that (1) the defendant was careless in providing information, (2) upon which the plaintiff was expected to rely, (3) the plaintiff did rely on the information, (4) the plaintiff suffered damage, and (5) the defendant is bound to the plaintiff by some duty of care. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775 (2d Cir. 2003).  "[L]iability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified."  Kimmell v. Schaefer, 89 N.Y.2d 257, 263 (1996).

Typically, the relationship that must be alleged to sustain a negligent misrepresentation claim is the same as the relationship that must be alleged to sustain a claim of fraudulent concealment.  See Deutsche Zentral-Genossenschaftsbank AG v. HSBC N. Am. Holdings, Inc., No. 12 Civ. 4025(AT), 2013 WL 6667601, at *16 (S.D.N.Y. Dec. 17, 2013); Goldfine v. DeEsso, 766 N.Y.S.2d 215, 216 (2d Dep't 2003).  As discussed above, Beach and Kelly have failed to allege the existence of a relationship between the Fund investors and CAI and Citigroup that would give rise to a duty of disclosure.  Therefore, the negligent misrepresentation claims against CAI and Citigroup are dismissed.

- 36 -

d.  Aiding and Abetting Fraud and Fraudulent Concealment

Under New York law, "[t]o establish liability for aiding and abetting fraud, the plaintiffs must show (1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." Lerner, 459 F.3d at 292 (internal quotation marks and citations omitted).

As discussed above, Beach and Kelly have not sufficiently alleged a claim of fraud arising out of CAI's marketing materials. As such, a claim of aiding and abetting premised on these documents must fail. The TAC does state a claim of fraud arising out of statements in the PPM, and a claim of fraud based on CPL's communications to investors.

Beach and Kelly allege that when they received the allegedly fraudulent PPM, CAI and Citigroup exercised supervisory authority over CPL and the Fund. This gives rise to an inference that CAI and Citigroup both knew of the statements in the PPM, and substantially assisted in drafting the PPM. Therefore, the TAC plausibly alleges that Citigroup and CAI aided and abetted CPL with respect to the allegedly fraudulent statements in the PPM.

The TAC also alleges that, from the time he replaced Pickett, Micko reported to the co-head of CAI's global fixed income group. This plausibly gives rise to an inference that CAI was aware of Micko's allegedly fraudulent letters to investors and that CAI provided substantial assistance in sending the letters. As such, the TAC plausibly alleges that CAI aided and abetted CPL in sending allegedly fraudulent communications to investors after the ProSieben transaction.

Regarding the remaining claims against CAI and Citigroup for aiding and abetting fraudulent concealment based on CPL's failure to disclose the ProSieben transaction to investors, and the claim against Citigroup for aiding and abetting CPL's allegedly fraudulent communications to investors, the TAC does not sufficiently allege substantial assistance. As

- 37 -

noted above, the TAC only alleges CAI and Citigroup's active involvement in overruling Pickett and forcing the consummation of the ProSieben transaction.  (See TAC ¶¶ 82, 95.)  The TAC alleges that Citigroup and CAI "caused" CPL to make false statements to investors and to fail to disclose information to them, but does not actually allege any affirmative actions to bring about this result.  (See TAC ¶ 177.)  In the absence of a fiduciary duty, which, again, has not been sufficiently pleaded, inaction on the part of an affiliated entity is not sufficient to sustain a claim of aiding and abetting fraud.  See Weksel, 511 N.Y.S.2d at 629.

Therefore, the aiding and abetting claims against Citigroup concerning CPL's alleged communications to investors are dismissed.  Similarly, the aiding and abetting claims against Citigroup and CAI arising out of CPL's allegedly fraudulent concealments are dismissed.

## CONCLUSION

For the foregoing reasons CPL and Pickett's motions to dismiss for lack of personal jurisdiction (Docket # 69, 76) are GRANTED.  CAI and Citigroup's motion to dismiss (Docket # 65) is DENIED with respect to the following claims:

- Fraudulent misrepresentation against CAI and Citigroup arising out of statements in the PPM and Fund subscription agreements

- Fraudulent misrepresentation against CAI arising out of CPL's communications to investors subsequent to the ProSieben transaction

- Aiding and abetting fraudulent misrepresentation against CAI and Citigroup arising out of statements in the PPM and Fund subscription agreements

- Aiding and abetting fraudulent misrepresentation against CAI arising out of CPL's communications to investors subsequent to the ProSieben transaction

CAI and Citigroup's motion to dismiss is GRANTED with respect to Beach and Kelly's other claims.

        SO ORDERED.

                                                       P. Kevin Castel
                                      United States District Judge

Dated: New York, New York
       March 7, 2014